152087 United States v. Dmitry Gordon Yes, this is a call. Good morning. Good morning, Your Honor. May it please the Court, Judges, my name is Ed McCall. I'm here on behalf of Dmitry Gordon. I would ask the Court's permission to reserve two minutes if that proves necessary. Yes. Thank you, sir. Dmitry had no prior criminal record before this event, before this charge, and his case, I think, reflects an important example of how difficult it is to defend many folks, especially minorities, who have important constitutional issues, as a court-appointed lawyer, which I was in this case, or in any circumstances, and to raise and protect their interests, their important issues, interests under the Constitution. Mr. Gordon was jailed for pretrial for about 18 months, 16 months, ultimately received a sentence of 29 months on a conditional plea, challenging the district court's refusal even to conduct an evidentiary hearing concerning the wiretap, including, in particular, the minimization failures of the government, notwithstanding the very compelling showing that we made, and refusing to conduct a Franks hearing concerning the affidavit that was submitted in support of those four different wiretap applications. That evidence was crucial to the case, crucial to his conviction, and the government, in defending the failure to have, for example, a hearing on minimization, has applied, or suggests this Court should apply, the wrong standard, the standard of a Franks hearing, which this Court earlier this year in Rodriguez, United States v. Rodriguez, recognizes a different standard than applies to a request for an evidentiary hearing on the question of whether, of other failures, and there were many failures here in the wiretap process, including the minimization requirement process. That's the one that I'm interested in, the minimization. So, Your Honor, faced with the very difficult prospect of my role in this case as a court appointed lawyer, and we received in discovery, in this case, over 20,000 pages of portable document format line sheets from the wiretap intercepts. We asked to get them electronically, so they're manipulable, so that we can study them. We asked to get the voice box software that the government uses so that we can use it to analyze this information. We're not allowed to have it. We do get those PDFs. We took, we analyzed the first 7,000 pages of those and submitted them with our motion. We did a detailed analysis of the first 550 intercepts and showed that what the government presented concerning minimization and what those reports submitted concerning minimization was wrong. The government responded with its summaries that had completely different numbers, but still showed that the government didn't minimize the vast majority of unrelated phone calls, including long phone calls. And in that process, it came to light that the government's interim reports that it had been making during the investigation included the wrong attachments, which nobody had noticed because that's not the adversarial process. So nobody's looking closely. Now we're looking closely, and these errors come to light. We had an argument, but not a hearing, on the question of minimization and whether we'd have a hearing. The government attorney, a very talented young lawyer, David Joyce, was asked, why did these reports show minimization when none occurred? And his answer is, I don't know. And from the record today, we don't know. There's some speculation from Agent Brown's affidavit that the court invited after the argument, the government got to submit an additional affidavit that presented its best light on the case. We were not given a chance to respond to that. There was no rebuttal to that, no opportunity to cross-examine Agent Brown concerning that affidavit, which still showed that the vast majority of even long, irrelevant calls were not minimized. Dmitry Gordon needed an opportunity to cross-examine the author of that affidavit, who said he generated these reports, and he was the expert who did it. He didn't use the word expert. But when you read his affidavit, what he did was enter in the voice box software dates and push run 10-day report. That's what he did. But when that supplementary affidavit was filed, did you ask the district court for permission to bring the affiant in and cross-examine? We had already asked for an evidentiary hearing. I know you had asked for an evidentiary hearing, but I'm asking a different question. After you made that request, there's a supplementary affidavit filed. You now say that you were deprived of an opportunity to challenge that affidavit. I ask you what I think is a simple question. Did you, when you received the affidavit, make any request of the district court for permission to depose or otherwise examine the client? My best recollection, Judge Celia, is that the district court judge requested the supplemental affidavit in a chamber's conference, and I believe that in the chamber's conference, I asked that we would have an opportunity, after getting any supplement, to have the evidentiary hearing that I requested. I don't recall... Is there any record of that? I don't recall whether that conference was transcribed, Your Honor. Can I change the subject a little bit? Yes, thank you, Your Honor. I'd like to ask you about the claim that you make to the effect that the government did not exhaust other methods of investigation before they applied for the wire test. Yes, Your Honor. And in that respect, I'll narrow down. The government claims that the use of the wire tap was necessary because the other, the GPS tracking and the cell, whatever it's called... Cell site. Cell site, did not provide the crucial information of who was talking to whom and what they were talking about. And therefore, they needed to carry out the wire taps. Yes, Your Honor. The government in this case, by the time of the wire taps, had an extraordinary wealth of information, including having organized and conducted purchases from the two leaders of the conspiracy, Mr. Victor and Mr. Dasano, and having known when they'd been to Boston to pick up drugs. I don't know exactly why the officials in Maine focus so hard on law enforcement in Boston and Lowell and Lawrence, but they do. And that's an interesting issue around... Well, the point is, they knew who was talking. They didn't know what they were talking about because you can't pick that information up from a GPS. Yes, Your Honor. And I respectfully submit that they didn't know much of the communications and knew the purposes of the trips because they were surveilling these folks and had purchased drugs from them and knew when they were buying drugs. So I respectfully submit that... And it's why we needed a hearing on this assertion. There was also an assertion that the GPS information isn't precise enough to figure out what address they're going to... In a city. In a city, like Boston or Lewiston, was the assertion. I respectfully submit that that is a misleading statement and should have been the object of the cross-examination at a Frank's hearing, which is a different standard than should have been applied to minimization, and that we should have been given that opportunity. But there's an interesting question about necessity here and the limits on it and the extent to which the government in these applications, affidavits, and orders, which are pretty plainly written by government counsel, establishes goals that can just never be satisfied. And the government has cited in its brief a prior First Circuit decision, allowing fairly broad goals, but these get broader and broader. Now they want to know precise details, and they use the word precise in their goals of their search, and of course that can never be accomplished, guarantees failure, and allows for them to have these wiretaps, which are becoming more topical now, whenever they want them for as long as they want them. And that's why we should have gotten a hearing on these issues, Your Honor. Thank you very much. Thank you. Ms. Bunker, good morning. Thank you. Good morning, Your Honor. May it please the Court, Renee Bunker, on behalf of the United States, I'll start with the minimization issue. And there is one statistic that stands out loudly here and below, and that is that Gordon has not identified one, he just mentioned reviewing 7,000 calls, there were far more than that. Not one intercepted call that was insufficiently or improperly minimized, not one. There was that one question that call number 6559 identified below between Mr. Azor and Dastanow, it was right after the discussion about Azor's drug bust, the case that was just argued. But the chart, the chart I'm looking at, Government Exhibit 11, shows there were 1,600 calls that were not pertinent. Only 949 of them were classified as pertinent, which as I read that chart means there were 700 calls in excess of two minutes that were not pertinent, and then there were 229 that were minimized, which therefore means roughly 500 non-pertinent calls of over two minutes were not minimized. Am I reading that chart incorrectly? I think Judge Kayada, with all due respect, you have jumped on my colleague's path, and it's contrary to the Supreme Court's teachings in Scott that blind statistics are not the path to the answer here in terms of the test is reasonableness. Did the government engage in reasonable minimization efforts? What they Well, no, I was responding to your point that they didn't have any evidence that even one call was not properly minimized, and it seems to me your own evidence suggests 500 or more calls or even 700 were not. Two more comments along those lines, or at least as Scott pointed out, there are a number of reasons why, three points, a number of reasons why an investigation may have a high number of non-minimized, non-pertinent calls. It could be that a lot of them are short, and I'll get to the two-minute thing. It could also be because a lot of them were first-time calls. It could be because a lot of them also involved ambiguous language, et cetera. And as the Supreme Court pointed out, that, well, and now let me get to the statistical point I wanted to make. It is incorrect to assume that the starting point, this is another reason why blind statistics are not particularly helpful. The starting point here is that the completed calls, or one starting point. So there were 15,000-plus completed calls once you divide, subtract the text messages, but that number includes completed calls between midnight and 8 a.m. So even the number of minimized completed calls is somewhat deceiving in the sense that it includes in the total completed calls between midnight and 8 a.m. when no one was in the monitoring room, and so those calls are not deemed pertinent or non-pertinent. So this shared subtraction doesn't work. What I hear you saying is there could be good explanations for why on your own statistical chart there appears to be so many non-minimized calls of over two minutes. What that's saying to me, though, is that the statistics themselves that you presented to the court aren't sufficient for the court to perform its supervisory obligations under the wiretap statute, that it's then left with just speculating that there could well be good reasons for this, but that's speculation. How does the court supervise, particularly with such a volume of calls, and as I understand it, you refused to provide defense counsel with anything other than PDF form so they were difficult to manipulate 20,000, what were there, 23,000 completed calls here? They had all the line sheets of the calls. They had all of the calls. They had all of this. In hard copy? Did they have it in native format? I don't think there were any tricks to hide anything. I don't know that they had the software from the voice box. I don't know if that's, but that's not really the issue. May I go to two points to the data? Well, what was the data? I mean, this is a block I've been around many times. Personally, it's a huge difference between getting PDF format or hard copy format and getting native format of the information in terms of your own ability to challenge it. What was the reason that the government had for refusing to supply the data in an electronically manipulable form? I don't know, Your Honor, and I don't know that the government refused to. I don't know what the nature of the discovery was. With 23,000 calls, if neither defense counsel nor the court have the data in a format that is workable, then how is the court going to be in a position to just do the supervision that the statute requires and our case law requires to make sure that the T's are being crossed and the I's are being doubted by the investigating officer? Two points. The case law is clear that we first look to the Lopez factors, which the district court appropriately did, and that's the nature and complexity of the case of the suspected crimes. That test was easily met, the court found, in terms of the leeway that the eavesdroppers should have had was at its zenith, given the nature of the crime. Then you look at the government's precautionary efforts towards minimization, and those two were the minimization orders were there, the prosecutor went over them with every single monitor. In fact, every phone that was tapped was, in fact, minimized. And then in terms of the degree of judicial oversight, the court ordered the 15-day reports. The court is presumed under London to have reviewed the materials. And what I would point out is, again, circling back, the cases where the court gets a fair analysis, be it 7,000 calls that my colleague just said he, in fact, had read, those cases where the analysis goes more deeply in terms of saying, geez, was this call early in the wiretap authorization period, so they needed a little more time to listen? Or was this call a little later, where they should have known that this was an attorney-client call? Those cases, the reason that analysis goes deeply is because those defendants raised a call. They actually identified, rather than just saying, hey, throw the whole thing out, which is what is being requested here, throw the whole thing out. That's the case in Scott. That's the case in Charles. That's the case in Hoffman. That's how a district court can get to a place where a reasonable analysis of the reasonable or not minimization efforts can be analyzed. But it's clear that to throw out an entire wiretap case, and the Carter opinion from the D.C. Circuit, when I talk about throwing it out, we're just talking about whether there should have been further inquiry. If the court below was in a position to perform its job of seeing that the minimization efforts were minimally sufficient, then the record before us should be sufficient where we can look at that record alone and tell that there was a basis for concluding it was adequate, right? Well, I think another way to look at it, looking at Carter, looking at the other opinions I just mentioned, looking at the Quintana, is in order to justify a hearing, a defendant, the government's burden is to show a prima facie showing of its reasonable minimization efforts. The burden then shifts to the defendant to come forward with something, and the something cannot be, geez, the Supreme Court has said that something cannot be, geez, you didn't minimize every single non-pertinent call, because that's not what the law requires. But the defendant has come forth with nothing. Not one single wrongfully minimized call, as Carter, I think, has instructed. Isn't showing there were over 500 non-minimized pertinent calls of the excess of two minutes, that's showing something, isn't it? I'm sorry, I missed the beginning of your question, Judge Kasich. Isn't showing that there were over 500 non-minimized calls in excess of two minutes showing something that pushes some obligation to you to provide some explanation, and then in the record, what's the proof that those could be explanations, do you think? No, not necessarily, but for two reasons. One is that the math is not necessarily correct where you can take the total calls over two and assume that all others, I guess you can for the, you can't do that from the completed calls, the sheer numbers, I disagree, if you have isolated, if you want to assume those numbers that every of the 1,616 calls of 229 were minimized and X number of those were pertinent, and you want to take the remaining that were non-pertinent, I still think the case law has a burden, and I think the case law supports this, to come forward and say these are the ones we think were improperly minimized, or this, there's a pattern here, or this one call, the government has this one time stepped over the line, and short of that, the case law supports the court's denial of a hearing, be it under the Fourth Amendment standard, which I think is an abuse of discretion, and here the district court found that my opponent, that he failed to raise any constitutional Fourth Amendment, colorable Fourth Amendment claim, based on the Lopez factors, and also just on failing to identify any call that had been improperly minimized, so that was the first type of hearing, and then it did get merged, I agree that the government's brief, in this case sort of merged the hearing analysis, but nor did he satisfy his, what appears to be a more difficult burden to obtain a Frank's hearing, which would require showing that the defendant made a knowing or, knowing the false statement, or one that was reckless. I take it on the issue of the exhaustion of investigative alternatives, you rest on your brief, you have nothing more to add. Actually your honor, the next case is a companion case, and we agree this defendant certainly preserved that issue, and he only, the next case only raises the necessity issue, so I can address that in the next case as well. With that we ask that you affirm, thank you. Thank you for listening to me, again your honors, I would like to address the Scott decision and the exchange between Judge Kayada and the government. Scott did involve a hearing, there was an evidentiary hearing on minimization in that the government relies on are best applied where there's a substantial showing as we did make here, and if I have to make a bigger showing than this, I'll never get a hearing on one of these wiretaps, and the amount of work in this is really a tremendous burden having only those PDFs, and Agent Brown's affidavit, for example, shows that you can sort the manipulable data and get a list of every minimized call, and I'm sure you can get a list of every minimized call, longer than two or five or ten minutes, anything you want, and if we had a hearing, the district court would understand the answer to all the questions that Judge Kayada is asking, and that supervisory role could be accomplished, and my client's rights would be protected. Scott involved the hearing, it involves the factors that might provide an adequate explanation, and then Scott did provide an adequate explanation as far as the Supreme Court was concerned. We did enough, Mr. Gordon did enough to get a hearing, the district court would have benefited by a hearing, the important limits on this wiretap statute could be applied if on the showing Mr. Gordon made, he got an evidentiary hearing, and the answers would clearly be in the record before this court, and then clear standards could be articulated as against evidence as opposed to speculation. Is there any place on the record you could point us to where you discussed with the court the format of the information being provided by the government? I'm not sure that that's in the record in this appeal, the fact that their PDFs are in the record because the 7,000 pages are submitted, and I know that in the Worthy case, we pressed all the way to motions trying to get a manipulable format, I don't know that we did that in Gordon, we focused on getting a hearing where that information could be brought to the court's attention, but we didn't request it in this case, but I don't think the record would reflect that, Your Honor.  Thank you, Calvin.